[No. 1,807.]

# EDWIN P. CLARKE v. GEORGE K. FITCH AND J. W. SIMONTON.

EXCESSIVE DAMAGES—NEW TRIAL.—The appellate Court will not review the judgment, as to whether the damages are excessive, unless a motion is made in the Court below for a new trial, and an appeal is taken from an order denying the same.

WORDS NOT LIBELOUS OF THEMSELVES.—The words " Clarke is a carpenter by trade, is interested in the Moore title, and has figured quite prominently in some of the squatter riots which have occurred in the Western Addition," are not libelous of themselves, as usually understood and received in this State.

A COLLOQUIUM IN COMPLAINT FOR LIBEL.—If it is intended to charge in a complaint that such words were used in an offensive sense, such as engaging in a riot to unlawfully invade the possessions of another, and were so understood by those who read them, there must be a colloquium in the complaint to show in what sense the words were libelous.

COLLOQUIUM AND INNUENDO.—A colloquium in a complaint for a libel cannot be supplied by an innuendo. The colloquium states the extrinsic facts

to show the libelous meaning of the words, and the innuendo applies the words to these facts.

POPULAR SENSE IN WHICH WORDS ARE USED.—Whether a publication is libelous *per se* is to be determined wholly by the sense in which the same is usually understood and received in this State; and when words have a general and notorious signification in this State, Courts will take judicial notice of it.

APPEAL from the District Court of the Fifteenth Judicial District, City and County of San Francisco.

The defendants were the publishers of a daily paper in San Francisco called the *Evening Bulletin.* One Moses Frank was indicted for forgery, and on the trial the plaintiff was a juror. The jury failed to agree, and the said paper published articles concerning the jury, of which the words quoted in the opinion formed a part.

The other facts are stated in the opinion of the Court.

*Pixley & Smith,* for Appellants.

There are two objections to this charge, but leaving the first to be discussed hereafter, we shall at present show: that the words, " Clark is a carpenter," etc., will admit of an inoffensive interpretation, are not of themselves libelous, and that the Court erred in charging them so to be. Judge CAMPBELL, of the Superior Court, lays down the rule of libel (*Bennett* v. *Williamson,* 4 Sand. 66), in the absence of *special* damages claimed and proved, thus: " Then does the publication in question charge the plaintiff with any offense which renders him amenable to punishment? or does it necessarily tend to hold him up to ridicule, hatred, contempt, or infamy?" In *Stone* v. *Cooper,* 2 Denio, 293, Chancellor WALWORTH defines a libel *per se,* to be the charge of an offense " that the Court can legally presume he has been degraded by, in the estimation of his acquaintances or the public." Holt, in his Law of Libel, page 223, says: " Everything written

of another, which holds him up to scorn and ridicule, that might reasonably be considered as provoking him to a breach of the peace, is a libel." And, again: "All such written abuse as may fairly be intended to impair him in the enjoyment of society, or throw a contempt upon him, which might affect his general fortune and comfort, is a positive injury, and, therefore, the subject of an action on the case."

To publish of Clark that he "is interested in the Moore title," was to give him financial credit. But assuming the "Moore title" to be a fraud, then it is necessary that the publication should have also charged Clark with a knowledge of that fraud. The words, "that thief A. hath stolen my goods and delivered them to Bacon," held not to give any right of action to Bacon, it not being alleged that he knew the goods were stolen. (*Bacon's Case,* Dal. 41, pl. 21.) "You have passed counterfeit money," non-actionable for the same reason. (*Pike* v. *Van Wormer,* 6 How. P. R. 171; *Church* v. *Bridgman,* 6 Miss. 190.) So of the words, "he received goods that were stolen and will be hanged for them." (*Ratcliff* v. *Long,* Palm. 67; *Miller* v. *Miller,* 8 Johns. 74; *Lampkins* v. *Justice,* 1 Smith, Ind. 322; *Griggs* v. *Vickroy,* 12 Ind. 549.)

To publish of E. P. Clark that he "has figured quite prominently in some of the squatter riots, which have occurred in the Western Addition," is certainly an inoffensive, if not creditable announcement. He may have been a policeman. He may have "figured" in those riots as a conservator of the peace. He may have been a Sheriff's officer. He may have "figured" there in support of judicial mandates and writs; or, as a good citizen, he may have sought to sustain municipal authority. He may have been enlisted as one of the *posse comitatus.* The expression is ambiguous, but not offensive, and the Court must have understood something not expressed in its direct words, upon which to base

his interpretation of its libelous character.   We have a right to claim that where the meaning of the words used are doubtful, they are not necessarily to be subjected to the most objectionable interpretation.   "Libelous words are to be construed according to their most obvious meaning."   (*Hogg* v. *Wilson*, 1 N. & M. 216; *Hawkinson* v. *Bilby*, 16 M. & W. 442; *Dorland* v. *Patterson*, 23 Wend. 424.)   If one man says of another, " he once killed a man," is that *per se* a charge of murder?   Lord Ellenborough (in *Rex* v. *Lambert*, 2 Camp. N. P. Case, 298) said: "Words are not to be taken in the more lenient, or the more severe sense, but in the sense which fairly belong to them, and which they were intended to convey."   But putting the very worst interpretation upon the sentence, of what offense does it accuse Clark? Of being a squatter and concerned in fights and affrays in the Western Addition, for, or in defense of, the possession of certain lands, perhaps his "interest in the Moore title " (as the phrases are so intimately associated).   " The office of the innuendo is to direct to its object the charge made.   It can neither enlarge nor restrain the natural sense and meaning.   When the application is explained the innuendo cannot aid them."   (*Tappan* v. *Wilson*, 7 Ham. 193.)

*Elisha Cook* and *William H. Patterson*, for Respondent.

The counsel has very ingeniously dissected the language made use of in the publication of those words, and thus attempted to prove that the same was not actionable.   It is libelous of itself.   One who indulges in such writing is not entitled to exercise of ingenious specifications to see if some sense cannot be discovered which would screen him from legal animadversion; but (2 Denio, 305) for the purpose of determining this question, it is necessary and proper to consider the whole a context, including everything said in the article.   We submit, therefore, that such words were construed by the Court, according to their most obvious mean-

ing. (*Hogg* v. *Wilson*, 1 N. & M. 216; *Hawkins* v. *Bilby*, 16 M. & W. 442; *Derland* v. *Patterson*, 23 Wend. 424.)

By the Court, CROCKETT, J.:

The action is for libel; and the jury returned a general verdict for the plaintiff for six thousand dollars. There was no motion for a new trial; and the appeal by the defendants is from the judgment.

So much of the evidence as is necessary to explain the exceptions taken to the rulings of the Court, in the progress of the trial, is brought up by a statement on appeal.

In the absence of a motion for a new trial, the question whether the damages are excessive does not arise on this appeal. If the defendants intended to assail the verdict on this ground, they should have moved for a new trial, assigning this as one of the reasons why it should be granted, and should have supported the motion by a proper statement. Having failed to do this, they have waived all objection to the verdict on this ground.

One of the alleged libels contains a sentence in these words, to wit: " Clark is a carpenter by trade, is interested in the Moore title, and has figured quite prominently in some of the squatter riots, which have occurred in the Western Addition."

The Court charged the jury that this portion of the publication " is libelous in and of itself; and it is a comment by the writer uncalled for by anything which appears in the affidavit published in the same article; and the defendant has given no evidence whatever, even tending to establish its truth, or that they had reason to believe it was true. It must, therefore, be considered by you to have been maliciously published, provided you find that it refers to the plaintiff in this cause, it having been published as a fact within the defendant's own personal knowledge." This charge was

excepted to by the defendants, and is assigned as error. It
certainly is not libelous to publish of a person that he is a
carpenter by trade; nor is it claimed to be so by the plain-
tiff. There is nothing in the record to explain what the
"Moore title" is, or that these words were used, or under-
stood in any peculiar sense. On their face, and without
explanation, the words, "is interested in the Moore title,"
import nothing derogatory to the plaintiff's character, and
are not libelous. But the plaintiff insists, with earnestness,
that the remainder of the paragraph, which alleges that he
has figured "quite prominently in some of the squatter riots,
which have occurred in the Western° Addition," is libelous
*per se,* and imputes to the plaintiff the offense of having
been "wrongfully and wantonly engaged in committing
breaches of the peace and riots." This is to be tested
wholly by the sense in which the words "squatter riots"
are usually understood and received in this State. What-
ever the phrase "squatter riot" may elsewhere mean, in its
popular sense, it has a well understood meaning in this State,
which is so general and notorious that we will take judicial
notice of it. Indeed, after the very numerous cases which
we have been called upon to adjudicate, arising out of what
are termed "squatter riots," we could not well affect to be
ignorant of the popular meaning of the phrase. It is one of
the most deplorable facts connected with the occupation
and settlement of this State by the emigrants who came in
1849, and afterwards, that, owing to the very large tracts in
which lands were claimed and held in private ownership,
and to the vague and uncertain boundaries by which they
were defined, and the doubtful tenures under which they
were often claimed, contests for the actual possession of
land commenced at an early period, and have ever since
continued; but latterly have been, fortunately, of less fre-
quent occurrence, since titles have become better settled,
and the boundaries of lands more accurately defined by

official surveys. These struggles for the possession were often bitter and fierce, and but too frequently resulted in violence and bloodshed. In these fierce contests one side or the other was, of course, in the wrong, as both could not be right. Nevertheless, it frequently happened that both supposed, in good faith, they were in the right. For example, a claimant under a Mexican grant, asserting a title to many square leagues of land, of a very small portion of which he was in the actual possession, would insist that a particular body of land was within the grant; whilst a "settler," in search of a preëmption claim, may have believed, in perfect good faith, either that the grant was fraudulent or that the particular tract which he desired to preëmpt was not within it. In this belief he would enter on the land, erect his cabin, and proceed to define his boundaries. On discovering this fact, the claimant under the grant, acting in the full belief that his grant was valid and included the land, would insist that the settler should vacate the premises. Angry words, followed by blows, would quickly succeed, and if each of the parties happened to be attended by several of his friends or sympathizers, this would be termed a "squatter riot." The "Western Addition" to the City of San Francisco is a large body of valuable lands at present included within the corporate limits. In 1852 the city filed a claim before the United States Land Commission for four square leagues of land, to which it claimed to be entitled as the successor of the former Pueblo of San Francisco or Yerba Buena. This claim was fiercely contested, both in and out of the Courts; but after many years of litigation was finally confirmed. In the meantime, however, a very large number of persons had settled upon these lands and defined their boundaries, generally by vague landmarks, often of the most transient and unsubstantial character. Ultimately it was deemed the better policy by the city authorities to donate these lands to the persons

actually in possession of them at a given date. This policy was approved by the Legislature, and the Congress of the United States, by a special Act, finally released the fee to the city in trust for the actual occupants in the manner defined in the Act. As the city grew and extended its streets, these lands rapidly enhanced in value; and the "Western Addition" soon became one of the most important sections of the metropolis. It is apparent from this brief recital that in numerous instances there must have arisen grave contests as to the possession. The title depended upon the fact of possession at a particular period, and the evidence of possession was often as vague as the boundaries. However much to be deplored, it was, perhaps, unavoidable, whilst human nature is constituted as it is, that serious struggles would arise for the possession of these valuable lands; and the records of our Courts attest the frequency and fierceness of these contests. In many instances, doubtless, unscrupulous persons, without a color or shadow of right, have wantonly invaded the possessions of others, trusting to force to maintain a possession acquired by violence or fraud; and if resisted in their unlawful purpose, a scene of violence and perhaps bloodshed would ensue. In other cases a contest would arise between the claimants of adjoining tracts as to the proper location of the division line, and a quarrel would ensue, ending, probably, in blows. It is unnecessary, however, to enter into a further detail of the various circumstances under which these contests have arisen, all of which are classed under the general head of "squatter riots," as that term is usually understood and applied in this State. In some of these cases one of the parties is a wanton aggressor, without excuse or palliation; whilst the other is simply defending his property against an unwarrantable invasion. In other cases the conflict arises from an honest difference of opinion as to their respective rights; and this has led to angry words and, per-

haps, blows. It is evident, therefore, that there are contests for the possession of land, in some of which one party is the aggressor wholly without excuse, whilst the other is justly defending his possession; and there are other cases in which both parties are acting in good faith, and have become involved in a quarrel and personal conflict arising wholly from an honest difference of opinion. We are not to be understood as in any degree justifying or excusing this latter mode of settling a disputed question of title or boundary. But if it were published of a person that he had "figured prominently" in a "squatter riot" of this description (and many such have occurred in the Western Addition), it would not be actionable. It would not be more libelous than to say of him that he had "figured prominently" in a street fight or any other personal conflict arising from a sudden heat of passion, without stating how the quarrel arose, or which party was in the wrong. The publication in the *Bulletin* does not state in what kind of "squatter riots" the plaintiff had "figured prominently," nor on which side he "figured;" whether as a lawless aggressor, wantonly invading the possession of another, or on the side of law and order in repelling an aggressor. If it was intended to charge that the words were used in the alleged libel in the offensive sense, and as importing a charge that the plaintiff had been engaged in a squatter riot, or in wantonly and unlawfully invading the possessions of others, and that the words were so understood by those who read them, there should have been a colloquium to explain the subject matter, and by proper averments to show in what sense the words were libelous, and that they were used and understood in that sense. (*Wilson* v. *Fitch*, decided at the present term.) But the want of a colloquium cannot be supplied by an innuendo. The extrinsic facts necessary to be stated, in order to show the libelous meaning of the words, must be set forth in the colloquium, and when these facts are stated the office of the

innuendo is to apply the words to these facts; but the innuendo cannot supply the place of the colloquium. (*Nichols* v. *Packard*, 16 Vt. 83; *Brown* v. *Brown*, 2 Shepley Me. R. 317; *Harris* v. *Burley*, 8 N. H. 256; *Linville* v. *Earlywine*, 4 Blackf. 169; *Tappan* v. *Wilson*, 7 Ohio R. 190.)

There being no colloquium in this case to explain in what kind of " squatter riots " nor on which side of them it was intended in the libel to charge the plaintiff with having " figured prominently," the Court erred in charging the jury that the words are libelous *per se*. Nor is there anything in the other portions of the alleged libel to show that these words were used in the injurious sense here claimed for them by the plaintiff. The more rational inference is that they were used to identify the plaintiff: first, as a carpenter by trade; second, as being one of those interested in the Moore title; and, third, as the same Clark who had figured prominently in some of the squatter riots in the Western Addition.

I think the Court obviously erred in this portion of the charge.

Judgment reversed and cause remanded for a new trial.

Mr. Justice WALLACE did not express an opinion.